Gideon Kracov (State Bar No. 179815)
LAW OFFICE OF GIDEON KRACOV
801 S. Grand Avenue, 11th Floor
Los Angeles, CA 90017-4645
Tel: (213) 629-2071
Fax: (213) 623-7755
Email: gk@gideonlaw.net

Arthur Pugsley (State Bar No. 252200)
Melissa Kelly (State Bar No. 300817)
LOS ANGELES WATERKEEPER
120 Broadway, Suite 105
Santa Monica, CA 90401
Tel: (310) 394-6162
Fax: (310) 394-6178
Email: arthur@lawaterkeeper.org
Email: melissa@lawaterkeeper.org

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a non-profit corporation, | Case No. _____ |
| Plaintiff, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES |
| vs. | |
| UNIVERSAL MOLDING COMPANY, INC. dba ALLOCAST TECHNOLOGIES, a corporation; UNIVERSAL MOLDING EXTRUSION COMPANY, INC., a corporation; NORTH STAR ACQUISITION, INC., a corporation; and DOES 1 to 10, | (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |
| Defendants. | |

COMPLAINT

1

LOS ANGELES WATERKEEPER ("LAW" or "Plaintiff"), a California non-profit corporation, by and through its counsel, hereby alleges:

## I.   **JURISDICTION AND VENUE**

1.     This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.     On July  5, 2016, Plaintiff provided notice of Defendants' violations of the Act, and of its intention to file suit against Defendants, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Santa Ana Region ("Regional Board"); and to Defendants UNIVERSAL MOLDING COMPANY, INC., dba ALLOCAST TECHNOLOGIES; UNIVERSAL MOLDING EXTRUSION COMPANY, INC.; NORTH STAR ACQUISITION, INC., and the responsible owners and operators of its facilities (referred collectively as

COMPLAINT

2

"UNIVERSAL MOLDING" or "Defendants"); as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of the notice letter is attached as Exhibit A, and is incorporated by reference.

3.     More than sixty days have passed since notice was served on UNIVERSAL MOLDING and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.  This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.     INTRODUCTION

5.     This Complaint seeks relief for discharges of storm water and non-storm water pollutants from Defendants' aluminum scrap recycling facility located at 10807 - 10890 Stanford Ave., Lynwood, California ("Facility 1"); its aluminum works finishing facility located  at 10840 - 10850 Drury Lane, Lynwood, California ("Facility 2"); its aluminum press and metal works manufacturing facility at 9151 East Imperial Highway, Downey, California ("Facility 3"); and its custom house manufacturing facility located at 14912 S Broadway, Gardena, California ("Facility 4") (referred collectively as the "Facilities"); in violation of the Act and National

COMPLAINT

Pollutant Discharge Elimination System ("NPDES") General Permit No. CA S000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ; as amended by Water Quality Order No. 97-03-DWQ, and Water Quality Order No. 2014-0057-DWQ (hereinafter the "Permit" or "General Permit"). The failures to comply with the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

6.     With every significant rainfall event millions of gallons of polluted storm water originating from industrial operations pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year.

7.     Los Angeles' waterways are ecologically sensitive areas and are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. The waterways provide aesthetic opportunities, such as wildlife observation, and the public uses these waterways for activities such as water contact sports and non-contact recreation.

8.     Industrial facilities that are discharging storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants contribute to the impairment of downstream waters and aquatic dependent wildlife, expose people to such toxins, and harm the special aesthetic and recreational significance Los Angeles'

COMPLAINT

waterways have for people in the surrounding communities. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

## III.   **PARTIES**

9.     Plaintiff LAW is a non-profit public benefit corporation organized under the laws of the State of California with its main office located at 120 Broadway, Suite 105, Santa Monica, California 90401.  LAW is an organization of the Waterkeeper Alliance, the world's fastest growing environmental movement.

10.     Founded in 1993, LAW is dedicated to the preservation, protection and defense of the inland and coastal surface and groundwaters of Los Angeles County. The organization works to achieve this goal through litigation and regulatory programs that ensure water quality protection for all waterways in Los Angeles County.  Where necessary to achieve its objectives, LAW directly initiates enforcement actions under the Act on behalf of itself and its members.

11.     LAW has approximately 3,000 members who live and/or recreate in and around the Los Angeles basin, including many who live and recreate along the Los Angeles and San Gabriel Rivers and connected waters and the Dominguez Channel. LAW members use and enjoy local waters and waterways to fish, surf, swim, sail, SCUBA dive, kayak, bird watch, view wildlife, hike, bike, walk, and run. Additionally, LAW's members use the waters to engage in scientific study through pollution and habitat monitoring and restoration activities.

12.     The unlawful discharge of pollutants from the Facilities into Compton

Creek, the Los Angeles River, the Los Angeles River Estuary, the San Gabriel River, the San Gabriel River Estuary, the Dominguez Channel, the Los Angeles/Long Beach Harbor, San Pedro Bay, and the Pacific Ocean (collectively "Receiving Waters")[1] impairs the ability of LAW members to use and enjoy these waters. Thus, the interests of LAW's members have been, are being, and will continue to be adversely affected by the Facilities' failure to comply with the Clean Water Act and General Industrial Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant(s)' activities.

13.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy or adequate remedy at law.

14.     Plaintiff alleges on information and belief that Defendant UNIVERSAL MOLDING COMPANY, INC., dba ALLOCAST TECHNOLOGIES is a California corporation that operates the Facilities in Lynwood, Downey, and Gardena, California.

15.     Plaintiff alleges on information and belief that Defendant UNIVERSAL MOLDING EXTRUSION COMPANY, INC. is a merged out California corporation that operates the Facility in Downey, California.

---

[1] The 2015 NOI on file with Regional Board for Facility 3 indicates that storm water discharges flow to Los Cerritos Channel, the beneficial uses of which include wildlife habitat, noncontact water recreation and warmwater habitat. Los Cerritos Channel is impaired for Copper, Zinc and Lead. However, upon information and belief, Waterkeeper herein alleges that Facility 3 drains to the San Gabriel River.

COMPLAINT

6

16.     Plaintiff alleges on information and belief that Defendant NORTH STAR ACQUISITION, INC. is a California corporation that operates the Facility in Gardena, California.

17.     Upon information and belief, and upon that basis, Plaintiff alleges that the true names, or capacities of DOES 1 through 10, inclusive (the "DOES"), whether individual, corporate, associate or otherwise, are presently unknown to PLAINTIFF, who therefore sue said Defendants by such fictitious names.  Plaintiff will amend this Complaint to show their true names and capacities when the same have been ascertained.  Whether or not UNIVERSAL MOLDING is associated with any other individual, corporate, associate or otherwise was not immediately apparent through an initial investigation completed by PLAINTIFF.

18.     UNIVERSAL MOLDING and DOES 1 through 10 are referred to collectively throughout this Complaint as Defendant or Defendants.

IV.    **STATUTORY BACKGROUND**

19.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

20.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33

COMPLAINT

U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

21.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Water Resources Control Board ("State Board") to issue NPDES permits, including general NPDES permits, in California. The objective of the Act is to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. §§ 1251(a), 1311(b)(2)(A). To this end, the Act prohibits the discharge of a pollutant from any point source into waters of the United States except in compliance with other requirements of the Act, including Section 402, which provides for NPDES permits. 33 U.S.C. §§ 1311(a), 1342(p). In California, the EPA has delegated it authority to issue NPDES permits to the State Board. 33 U.S.C. §§ 1342(b), (d). The Los Angeles Regional Water Quality Control Board ("Regional Board") is responsible for issuance and enforcement of the General Industrial Permit in Region 4, which covers both the Facilities and Receiving Waters.

22.     The State Board elected to issue a statewide General Permit for industrial storm water discharges. The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997 ("1997 Permit") and April

1, 2014 ("2015 Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

23.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

24.     The General Permit contains several prohibitions.  The *Effluent Limitation* section B(3) of the 1997 Permit and V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  *Receiving Water Limitation* C(1) of the 1997 Permit prohibits storm water discharges and authorized non-storm water discharges to surface water that adversely impact human health or the environment.  The 2015 Permit includes the same Receiving Water Limitation.  See 2015 Permit, § VI.B. Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment constitute violations of these Receiving Water Limitations.  See 1997 Permit, § C(1); 2015 Permit, § VI.B. *Receiving Water Limitation* C(2) of the 1997 Permit prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of an applicable Water Quality Standard ("WQS").  The 2015 Permit includes the

same receiving water limitation. See 2015 Permit, § VI.A.  Discharges that contain

pollutants in excess of an applicable WQS violate these Receiving Water Limitations.

See 1997 Permit, § C(2); 2015 Permit, § VI.A.

25.    In addition to absolute prohibitions, the General Permit contains a variety

of substantive and procedural requirements that dischargers must meet.  Both the 1997

Permit and the 2015 Permit generally require facility operators to: i) submit a Notice

of Intent ("NOI") certifying the type of activity or activities undertaken at a facility

and committing the operator to comply with the terms and conditions of the Permit; ii)

eliminate unauthorized non-storm water discharges; iii) develop and implement a

Storm Water Pollution Prevention Plan ("SWPPP"); iv) perform monitoring of storm

water discharges and authorized non-storm water discharges; and v) file an Annual

Report summarizing the year's industrial activities and certifying compliance with the

General Industrial Permit.

26.    The SWPPP must describe storm water control facilities and measures

that comply with the BAT and BCT standards.  The General Permit requires that an

initial SWPPP have been developed and implemented before October 1, 1992.  The

SWPPP must, among other requirements, identify and evaluate sources of pollutants

associated with industrial activities that may affect the quality of storm and non-storm

water discharges from the facility and identify and implement site-specific best

management practices ("BMPs") to reduce or prevent pollutants associated with

industrial activities in storm water and authorized non-storm water discharges

COMPLAINT

(Section A(2)).  Among other requirements, the SWPPP must include the following: a pollution prevention team; a site map with detailed demarcations of potential pollutant sources, storm water flows and discharge/sampling points; a description and assessment of potential pollutant sources; and a description of BMPs, including both structural and non-structural techniques.  Section X(D)-X(I) of the 2015 Permit sets forth essentially the same SWPPP requirements, except that all dischargers are now required to develop and implement a set of minimum BMPs, as well as advanced BMPs as necessary to achieve BAT/BCT.  See 2015 Permit § X(H).  The 2015 Permit further requires certain SWPPP enhancements, including a more comprehensive assessment of potential pollutant sources and more specific BMP descriptions.  See 2015 Permit §§ X(G)(2), (4), (5).

27.     The objectives of the requirement to development, maintain and revise a SWPPP are to identify pollutant sources and develop BMPs that reduce or prevent polluted storm water from negatively affecting Receiving Waters and California communities.  See 1997 Permit § A(2); 2015 Permit § X(C).  BMPs must achieve compliance with the Permit's Effluent Limitations and Receiving Water Limitations.  To ensure compliance, the SWPPP must be evaluated and revised as necessary.  See 1997 Permit §§ A(9)-(10); 2015 Permit § X(B).  Failure to develop or implement an adequate SWPPP, or revise an existing SWPPP as necessary, is an independent Permit violation.  See 2015 Fact Sheet § I(1).

28.     Also, the 1997 Permit requires facility operators to develop and

implement an adequate *Monitoring and Reporting Program* before industrial activities begin at a facility. See 1997 Permit, § B(1). The 2015 Permit contains substantially identical requirements. See 2015 Permit, § XI. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharges to ensure compliance with the Permit's Effluent Limitations and Receiving Water Limitations. An adequate Monitoring and Reporting Program must be reviewed and revised in response to analyses and observations in order to ensure that BMPs are effectively reducing and/or eliminating pollutants from the Facilities' activities from entering the River, downstream waters and surrounding communities. Furthermore, the Permit includes specific provisions requiring the Facilities to revise and improve BMPs when analytical results demonstrate an exceedance of a NAL. See 2015 Permit, § XII.

29.    The 1997 Permit and 2015 Permit both contain the same basic requirements, which include conducting visual observations of storm water discharges and authorized non-storm water discharges, collecting and analyzing samples of storm water discharges for relevant pollutants, revising and changing the SWPPP and/or facility operations as necessary in response to analytical data, and filing an Annual Report with the State Board. See e.g. 1997 Permit §§ (B)3-(B)16.

30.    Further, the 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm even of a wet season, and at least one other storm event during a reporting year. See 1997 Permit, § B(5).

COMPLAINT

The 2015 Permit created a more demanding schedule, and requires the Facilities to sample and analyze four storm water discharges over the course of a reporting year. See 2015 Permit, § XI(B)(2). Under the 1997 Permit, facilities must sample from qualifying storm events, which occur when there is a discharge of storm water during facility operating hours that was preceded by at three working days without a storm water discharge. See 1997 Permit, § B(5)(b). The 2015 Permit broadens the definition of qualifying storm event by requiring only 48-hours without a storm water discharge from any drainage area. See 2015 Permit, § XI(B)(1)(b). A sample must be collected from each discharge point at the Facilities, and in the event that an operator fails to collect from each discharge point, the operators must still collect samples from two other storm events and explain in the Annual Report why the first storm event was not sampled.

31.     The General Industrial Permit requires all facilities to sample and analyze storm water discharges for the following parameters: pH, total suspended solids ("TSS"), specific conductivity ("SC"), and total organic content ("TOC") or oil and grease ("O&G"). 1997 Permit, § B(5)(c)(i); 2015 Permit, §§ XI(B)(6)(a)-(b). The Permit further requires discharges to sample for parameters dependent on a facility's standard industrial classification ("SIC") code. *Id.*

32.     The General Permit does not provide for any mixing zones by dischargers. The General Permit does not provide for any dilution credits to be applied by dischargers.

33.     The Regional Board issued the "Water Quality Control Plan—Los Angeles Region: Basic Plan for the Coastal Watersheds of Los Angeles and Ventura County" ("Basin Plan").  The Basin Plan identifies the "Beneficial Uses" of the portions of the Los Angeles River Watershed that receive polluted storm water discharges from the Facilities.  These Beneficial Uses include: water contact recreation ("REC 1"), non-contact water recreation ("REC 2"), warm freshwater habitat ("WARM"), ground water recharge ("GWR"), wildlife habitat ("WILD"), wetland ("WET"), estuarine habitat ("EST"), industrial service supply ("IND"), navigation ("NAV"), marine habitat ("MAR"), commercial fishing ("COMM"), rare, threatened, or endangered ("RARE"), migration of aquatic organisms ("MIGR"), and spawning, reproduction and/or early development ("SPWN").  See Basin Plan, Table 2-1.

34.     According to the 2010 303(d) List of Impaired Water Bodies, Compton Creek is impaired for copper, lead, pH, coliform bacteria, and trash. Reaches 1 and 2 of the Los Angeles River are impaired by pollutants such as pH, cyanide, diazinon, lead, nutrients, ammonia, cadmium, coliform bacteria, copper, trash, zinc, and oil. The Los Angeles River Estuary is impaired by, among other pollutants, chlordane, sediment toxicity, and trash.  The Los Angeles/Long Beach Harbor is impaired by at least chrysene, copper, sediment toxicity, mercury, and zinc.  The San Pedro Bay is impaired by sediment toxicity, and the Long Beach City Beach, one of the San Pedro Bay beaches, is impaired by indicator bacteria.  Los Cerritos Channel is impaired for

COMPLAINT

copper, lead and zinc.  The Dominguez Channel is impaired for, among other pollutants, copper, lead, zinc, indicator and coliform bacteria, and sediment toxicity. The San Gabriel River Reaches 1 and 2 are impaired for, among other pollutants, lead, indicator and coliform bacteria, and pH. The San Gabriel River Estuary is impaired for copper and nutrients, among other pollutants.

35.     Discharges from the Facilities cause and/or contribute to the degradation of these already impaired surface waters, beaches, and aquatic dependent wildlife. The pollutants discharged into the Compton Creek, the Los Angeles River, the Dominguez Channel, the Los Cerritos Channel and the San Gabriel River from the Facilities flow to the Pacific Ocean via the Los Angeles River Estuary, Los Angeles/Long Beach Harbor, San Gabriel River Estuary, and San Pedro Bay. Contaminated storm water discharges, including those from the Facilities, must be eliminated if the Los Angeles area's aquatic ecosystems have any chance to regain their health.

36.     The EPA published "benchmark" levels as numeric thresholds to aid in determining whether a facility discharging industrial storm water had implemented the requisite BAT and/or BCT as mandated by the Act.  See United States Environmental Protection Agency NPDES Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity, as modified effective May 9, 2009.  EPA's benchmarks serve as objective measures for evaluating whether a permittee's BMPs achieve BAT/BCT standards as required by Effluent Limitation B(3) of the 1997

Permit.  Under the 2015 Permit, the State Board replaced the use of "benchmarks" with Numeric Action Levels ("NALs").  See 2015 Permit, § V(A).  NALs are derived from, and function similar to, EPA benchmarks.  See 2015 Permit Fact Sheet, § I(D)(5).  Benchmarks and NALs represent pollutant concentrations at which a storm water discharge could impair, or contribute to impairing, water quality and/or affect human health.

37.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $32,500 per day per violation for all violations occurring through January 12, 2009, and $37,500 per day per violation for all violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  See also 40 C.F.R. §§ 19.1 - 19.4.

## V.     **STATEMENT OF FACTS**

38.     On information and belief, Plaintiff alleges that the management practices at UNIVERSAL MOLDING's Facilities do not prevent sources of contamination described herein from causing discharges of pollutants into the waters of the United States. More specifically, each of its Facilities are in violation of the: 1) Permit's Effluent Limitations, 2) Receiving Water Limitations, and 3) Monitoring

1     and Reporting Program.

2         *A. Facility 1 and Facility 2*

3         39.    According to information and belief, Facility 1 and Facility 2 are owned

4     and/or operated by UNIVERSAL MOLDING. As explained below, Defendants

5

6     improperly reported Facility 1 and 2 as a single facility until 2015.

7         40.    For Facility 1, Defendant obtained Permit coverage on August 18, 2015

8

9     under the 2015 Permit ("NOI 2015").  Plaintiff is informed and believes Facility 1

10    previously was enrolled for coverage under the 1997 Permit.  The Waste Discharge

11

12    Identification ("WDID") number for  Facility 1 is 19I014397.  The Primary SIC code

13    is 3341 (Secondary Smelting and Refining of Nonferrous Metals).  The NOI filed

14

15    with the State Board in 2015 and Annual Report 2012-13 indicates Facility 1's

16    secondary SIC codes are 3363 (Aluminum Die Casting), 3442 (Metal Doors, Sash,

17    Frames, Molding, and Trim Manufacturing), and 3479 (Coating, Engraving, and

18

19    Allied Services).

20        41.    Facility 1 is located at 10807 - 10890 Stanford Avenue, Lynwood

21    address, where industrial activities include, but may not be limited to, recycling scrap

22

23    aluminum where aluminum scraps are melted to a semi-fluid paste, cast into

24    aluminum billet, which are then shipped back to aluminum extruders for extruding

25    into various shapes. According to its 2015 SWPPP, UNIVERSAL MOLDING

26    identifies the following pollutants as stored, used and/or produced on site: Cooling

27

28    Tower Water Microbiocide, Cooling Tower Water Treatment, Chemlube 5000 ELV

COMPLAINT

Synthetic Lubricant, Silicone, Titanium, Cooper, Chromium, Aluminum, Water Tower Sludge Waste. Storm water from activities at this location flow from the property into Compton Creek, the Los Angeles River, and ultimately, to the Pacific Ocean from at least two and as many as seven locations.

42.     For Facility 2, Defendant obtained Permit coverage September 16, 2015 ("NOI 2015") with a WDID number of 19I026222.  Before receiving coverage, however, UNIVERSAL MOLDING submitted Annual Reports that purported to treat Facility 1 and Facility 2 as single facility, and or submitted Annual Reports using the same WDID for Facility 1.  Furthermore, Annual Reports available for Facility 1 and Facility 2 include various and inconsistent addresses. According to the NOI 2015, Facility 2 is classified under SIC Codes 3442 (Metal Doors, Sash, Frames, Molding, and Trim Manufacturing), 3443 (Fabricated Plate Work), 3479 (Coating, Engraving, and Allied Services), and 9999 (Non-Classifiable Establishments).

43.     Facility 2 is located at 10840-10850 Drury Lane, Lynwood where industrial activities include, but may not be limited to, finishing extruded aluminum for custom applications by cleaning, anodizing, and coloring aluminum extrusions for various applications. The anodizing process requires soaking aluminum in various chemical "process" baths, and then finishing per requested specifications. Like Facility 1, stormwater from activities at this location flows from the property into Compton Creek, the Los Angeles River, and ultimately to the Pacific Ocean; but from

COMPLAINT

1    at least five and as many as seven discharge points.[2]

2        44.    According to its 2015 SWPPP, Facility 2 generates unknown quantities

3    of various Hazardous Wastes.  Non-RCRA hazardous wastes on site are filter cake

4    (primarily composed of aluminum hydroxides), nickel, sodium, iron, calcium,

5    magnesium hydroxides and salts.  UNIVERSAL MOLDING also identifies the

6    following pollutants as stored, used and/or produced on site: Liquid Caustic Soda, SC

7    Caustic – AD, Anofast, Sulfuric Acid, Hougto-Etch AX-2050, NF Alumseal 101,

8    Cleaner GP, Desmutt Non-Chromated Deoxidizer, Bronze Electrocoler, Ferric

9    Ammonium Oxalate Bath, and Waste Oil.

10       45.    Since at least May 4, 2012, UNIVERSAL MOLDING has taken samples

11   or arranged for samples to be taken of storm water discharges at Facility 1. However,

12   because UNIVERSAL MOLDING reported Facility 1 and 2 as a single facility until

13   2015, it is unclear whether sample results prior to December 22, 2015 were for

14   Facility 1 or Facility 2. Nevertheless, the sample results were reported in the Facility

15   1's annual reports submitted to the Regional Board.  UNIVERSAL MOLDING

16   certified each of those annual reports pursuant to Sections A and C of the General

17   Permit.

18       46.    *Effluent Limit Violations*.  According to information available to LAW,

19   including a thorough review of both electronic and hard copy files held by the State

---

[2]  The 2015 SWPPP indicates there are only two (2) discharge points, but that information is
inconsistent with information contained in various Annual Reports on file with the Regional Board.
Plaintiff will seek to clarify the number and location of any and all discharge points at Facility 2.

COMPLAINT

19

Board, Facility 1 and Facility 2 has been in continuous violation of the Permit's Effluent Limitations for the entirety of the relevant statute of limitations, at least with respect to aluminum (Al), copper (Cu), iron (Fe), nitrates of nitrogen (N+N), lead (Pb), pH, and zinc (Zn). The pattern of exceedances of benchmark/NAL values over more than 4 years confirms UNIVERSAL MOLDING's failure to implement adequate BMPs and its ongoing violation of the Permit and Act.

47. The data available to LAW, as reported to the Regional Board by UNIVERSAL MOLDING, relevant to Facility 1 and Facility 2's violations of the Permit's Effluent Limitation are summarized below at Table 1. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

## TABLE 1
### SAMPLING DATA DEMONSTRATES ONGOING EXCEEDANCES OF EFFLUENT LIMITATIONS FOR MULTIPLE POLLUTANTS

| DATE | PARAMETER | OBSERVED CONCENTRATION | EPA BENCHMARK | APPLICABLE NAL (After 7/1/15) | Facility |
|------|-----------|------------------------|---------------|-------------------------------|----------|
| 5/4/12 | Cu | 0.035 mg/L | 0.0332 mg/L | n/a | 1 or 2 |
| 5/4/12 | N+N | 2.27 mg/L | 0.68 mg/L | n/a | 1 or 2 |
| 5/4/12 | Zn | 0.326 mg/L | 0.117 mg/L | n/a | 1 or 2 |

COMPLAINT

| | | | | | |
|---|---|---|---|---|---|
| 5/14/15 | pH | 5.56 pH units | 6.0-9.0 pH units | n/a | 1 or 2[3] |
| 5/14/15 | pH | 5.64 pH units | 6.0-9.0 pH units | n/a | 1 or 2 |
| 5/14/15 | pH | 5.59 pH units | 6.0-9.0 pH units | n/a | 1 or 2 |
| 5/14/15 | Al | 4.05 mg/L | 0.75 mg/L | n/a | 1 or 2 |
| 5/14/15 | Al | 4.17 mg/L | 0.75 mg/L | n/a | 1 or 2 |
| 5/14/15 | Al | 4.36 mg/L | 0.75 mg/L | n/a | 1 or 2 |
| 5/14/15 | Fe | 2.72 mg/L | 1.0 mg/L | n/a | 1 or 2 |
| 5/14/15 | Fe | 2.34 mg/L | 1.0 mg/L | n/a | 1 or 2 |
| 5/14/15 | Fe | 2.81 mg/L | 1.0 mg/L | n/a | 1 or 2 |
| 5/14/15 | Zn | 2.43 mg/L | 0.117 mg/L | n/a | 1 or 2 |
| 5/14/15 | Zn | 0.23 mg/L | 0.117 mg/L | n/a | 1 or 2 |
| 5/14/15 | Zn | 0.261 mg/l | 0.117 mg/L | n/a | 1 or 2 |
| 12/22/15 | N+N | 6.28 mg/L | n/a | 0.68 mg/L | 1 |
| 12/22/15 | Al | 1.2 mg/L | n/a | 0.75 mg/L | 1 |
| 12/22/15 | Zn | 3.9 mg/L | n/a | 0.26 mg/L | 1 |
| 12/22/15 | Al | 0.805 mg/L | n/a | 0.75 mg/L | 2 |
| 1/5/16 | Fe | 1.48 mg/L | n/a | 1.0 mg/L | 1 |
| 1/5/16 | Fe | 1.96 mg/L | n/a | 1.0 mg/L | 1 |
| 1/5/16 | Al | 1.2 mg/L | n/a | 0.75 mg/L | 1 |

---

[3] Plaintiff believes samples from 5/14/15 are taken at Facility 2 based on notes on the laboratory's intake forms.  These forms, however, are unclear and may indicate that the samples combine discharges from as many as five (5) discharge points—under Client Sample ID, the lab filled in "#1,2,3,4,5 Middle."

COMPLAINT

| 1/5/16 | Al | 2.5 mg/L | n/a | 0.75 mg/L | 1 |
|---|---|---|---|---|---|
| 1/5/16 | Cu | 0.10 | n/a | 0.0332 mg/L | 1 |
| 1/5/16 | Cu | 0.055 | n/a | 0.0332 mg/L | 1 |
| 1/5/16 | Zn | 0.98 mg/L | n/a | 0.26 mg/L | 1 |
| 1/5/16 | Zn | 3.0 mg/L | n/a | 0.26 mg/L | 1 |
| 1/5/16 | Pb | 0.78 | n/a | 0.262 mg/L | 1 |

48.    The results of storm water sample analyses between May 2012 and January 2016 (as summarized in Table 1) show consistent exceedances of the EPA benchmark levels and relevant NALs for various indicator parameters at Facilities 1 and 2.  Information available to LAW, including the sampling data summarized above in Table 1, demonstrates that Facility 1 and Facility 2 have not implemented BMPs that achieve compliance with the Act's BAT/BCT mandates.

49.    *Receiving Water Violations*.  The primary Receiving Water Limitation requires that industrial storm water discharges not cause or contribute to an exceedance of applicable WQS,[4] including those established by EPA, contained in a Statewide Water Quality Control Plan, the Criteria for Priority Toxic Pollutants in the State of California ("CTR"), 40 C.F.R. § 131.38, CTR, or set in the Basin Plan.  1997 Permit C(2); 2015 Permit VI(A).  Discharges that contain pollutants in excess of an

---

[4] Industrial storm water discharges must strictly comply with water quality standards, including those criteria listed in the applicable basin plan.  *See Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999).

COMPLAINT

applicable WQS violate these primary Receiving Water Limitations.  The secondary Receiving Water Limitation requires that industrial storm water discharges not adversely affect human health or the environment.  1997 Permit C(1); 2015 Permit VI(B).  Discharges that contain pollutant concentrations that exceed levels known to adversely impact aquatic species and the environment constitute violations of the secondary Receiving Water Limitation of the Permit.

50.     Facility 1 and Facility 2 drain to Compton Creek, the Los Angeles River and ultimately into the Pacific Ocean near popular coastal resources.   Based on information and belief, sampling data reported to the State and Regional Boards demonstrate that storm water discharges from Facility 1 and Facility 2 contain concentrations of pollutants that exceed primary and secondary Receiving Water Limitations.  These data provide further evidence of Facility 1 and Facility 2 have not developed and implemented adequate BMPs.

51.     The Basin Plan identifies beneficial uses of the Receiving Waters to include, among others, municipal and domestic water supply, groundwater recharge, water contact recreation, non-contact water recreation, warm freshwater habitat, and wildlife habitat.  The Basin Plan provides a chemical constituent standard that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use.  Water designated for use as Domestic or Municipal Supply (MUN) shall not contain concentrations of chemical constituents in excess of the limits specified in the following provisions of Title 22 of

COMPLAINT

the California Code of Regulations which are incorporated by reference into this plan: Table 64431-A of Section 64431 (Inorganic Chemicals)…"   The Basin Plan provides a Maximum Contaminant Level ("MCL") for Al of 1 mg/L.

52.     The EPA 303(d) List of Water Quality Limited Segments lists Reach 1 of the Los Angeles River as impaired for zinc.  As a result, the Basin Plan contains additional water quality standards for the Los Angeles River in an amendment setting forth Total Maximum Daily Loads ("TMDLs") for the Los Angeles River.   For General Industrial Permit holders, the Basin Plan sets forth interim wet-weather concentration-based waste load allocations ("WLAs") that have been enforceable conditions for discharges since January 11, 2011.  There is a WLA for zinc of 0.117 mg/L.  Further, the CTR contains a freshwater numeric water quality standard for zinc of 0.120 mg/L (Criteria Maximum Concentration – "CMC").  65 Fed.Reg. 31712 (May 18, 2000).  Therefore, those discharges described in TABLE 1 constitute independent and distinct violations of the Permit's primary Receiving Water Limitations.

53.     Waterkeeper's review of the sampling data reported to the State and Regional Boards demonstrates that Facility 1 and Facility 2 have discharged and continue to discharge polluted storm water containing pollutant concentrations that violate secondary Receiving Water Limitations .  Discharges from Facility 1 and Facility 2 contain chemicals such as iron, aluminum, lead and zinc, which can be acutely toxic and/or have sub-lethal impacts on the avian and aquatic wildlife in the

COMPLAINT

Receiving Waters, and therefore these discharges adversely impact human health and the environment in violation of secondary Receiving Water Limitations.

54.   *Monitoring and Reporting Program Violations*.  On information and belief, Plaintiff further alleges that since at least May 4, 2012, Defendants did not conduct business operations consistent with the Permit or Act because Facility 1 and Facility 2 have violated and continue to violate the Permit's monitoring and reporting program ("M&RP") requirements.

55.   Facility 2 submitted an NOI in September of 2015, Facility 2 was not enrolled in the Permit and was, from time to time, submitting Annual Reports that purported to treat Facility 1 and Facility 2 as single facility, and or submitting Annual Reports using the WDID for Facility 1.

56.   Annual Reports available for Facility 1 and Facility 2 include various and inconsistent addresses.  Additionally, those Annual Reports submitted have included inconsistent information regarding the number and locations of storm water discharges.  And for certain reporting years, Facility 1 and/or Facility 2 have failed to submit Annual Reports.

57.   Lastly, Facility 1 and Facility 2 have failed to collect the requisite number of storm water samples, and failed to test samples for all parameters, which include, pursuant to the 1997 Permit B(5)(c)(ii)-(iii) and the 2015 Permit XI(B)(6)(c)-(d), the constituents Al, Cu, Hg (Mercury), Mg (Manganese), Pb, Fe, Zn, Ti (Titanium) and Cr (Chromium).

COMPLAINT

*B. Facility 3*

58.     Facility 3 is owned by the Defendant and/or operated by UNIVERSAL MOLDING EXTRUSION COMPANY, INC.[5]

59.     Defendant obtained Permit coverage on September 21, 2015 ("NOI 2015") with a WDID number of 19I013881. Plaintiff is informed and believes Facility 3 previously was enrolled for coverage under the 1997 Permit. Facility 3 is classified under SIC Codes 3499 (Fabricated Metal Products, Not Elsewhere Classified), 3354 (Aluminum Extruded Products), and 3479 (Coating, Engraving, and Allied Services).

60.     Facility 3 is located at 9151 East Imperial Highway, Downey, where industrial activities include, but may not be limited to, operating an aluminum extrusion press, fabricating steel parts, and conducting powder coating and painting processes for aluminum and steel parts. According to its 2015 SWPPP, UNIVERSAL MOLDING identifies the following pollutants as stored, used and/or produced on site: Hydraulic And Mobil Oil, Transmission Fluid, Sodium Hydroxide, Powder Paint, Metal Working Fluid, Cor Clene 5011, Sulfuric Acid, And Waste Oil.

61.     On information and belief, Plaintiff alleges storm water from Facility 3's industrial activities at this location flow from the property into the Los Cerritos Channel, then the San Gabriel River, and ultimately into the Pacific Ocean; from at least two, and perhaps more, discharge points.

---

[5] According to information obtained from the Secretary of State of the State of California, UNIVERSAL MOLDING EXTRUSION COMPANY, INC.'s legal status is "merged out," and therefore this entity may not be conducting business at this address.

COMPLAINT

26

62.   *Effluent Limit Violations*.   Like Facility 1 and Facility 2, Facility 3 has been in continuous violation of the Permit's Effluent Limitations for the entire relevant statute of limitations with respect to Al, Cu, Fe, N+N, and Zn.  Facility 3 also shows a pattern of exceedances of benchmark/NAL values over more than 4 years which confirms UNIVERSAL MOLDING did not implement adequate BMPs and an ongoing violation of the Permit and Act.  As reported to the Regional Board by UNIVERSAL MOLDING, the relevant data to Facility 3's violations are summarized below at Table 2.   Again, self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v Union Oil*, 813 F.2d at 1493.

## TABLE 2
### SAMPLING DATA DEMONSTRATES ONGOING EXCEEDANCES OF EFFLUENT LIMITATIONS FOR MULTIPLE POLLUTANTS

| DATE | PARAMETER | OBSERVED CONCENTRATION | EPA BENCHMARK | APPLICABLE NAL (After 7/1/15) | Facility |
|---|---|---|---|---|---|
| 2/15/12 | Zn | 0.241 mg/L | 0.117 mg/L | n/a | 3 |
| 2/15/12 | Zn | 0.192 mg/L | 0.117 mg/L | n/a | 3 |
| 2/15/12 | Zn | 0.208 mg/L | 0.117 mg/L | n/a | 3 |
| 2/15/12 | Zn | 0.345 mg/L | 0.117 mg/L | n/a | 3 |
| 2/15/12 | Cu | 0.041 mg/L | 0.0332 mg/L | n/a | 3 |
| 2/15/12 | Cu | 0.041 mg/L | 0.0332 mg/L | n/a | 3 |

| | | | | | |
|---|---|---|---|---|---|
| 2/15/12 | Cu | 0.049 mg/L | 0.0332 mg/L | n/a | 3 |
| 2/15/12 | Cu | 0.055 mg/L | 0.0332 mg/L | n/a | 3 |
| 2/15/12 | N+N | 2.11 mg/L | 0.68 mg/L | n/a | 3 |
| 2/15/12 | N+N | 2.48 mg/L | 0.68 mg/L | n/a | 3 |
| 2/15/12 | N+N | 1.78 mg/L | 0.68 mg/L | n/a | 3 |
| 2/15/12 | N+N | 3.44 mg/L | 0.68 mg/L | n/a | 3 |
| 5/14/15 | Al | 1.28 mg/L | n/a | 0.75 mg/L | 3 |
| 5/14/15 | Al | 3.10 mg/L | n/a | 0.75 mg/L | 3 |
| 5/14/15 | Zn | 0.277 mg/L | n/a | 0.26 mg/L | 3 |
| 5/14/15 | Fe | 4.23 mg/L | n/a | 1.0 mg/L | 3 |
| 1/5/16 | Fe | 7.08 mg/L | n/a | 1.0 mg/L | 3 |
| 1/5/16 | Fe | 1.08 mg/L | n/a | 1.0 mg/L | 3 |
| 1/5/16 | Al | 7.70 mg/L | n/a | 0.75 mg/L | 3 |
| 1/5/16 | Al | 1.50 mg/L | n/a | 0.75 mg/L | 3 |
| 1/5/16 | Zn | 1.3 mg/L | n/a | 0.26 mg/L | 3 |
| 1/5/16 | Zn | 0.51 mg/L | n/a | 0.26 mg/L | 3 |
| 1/5/16 | Cu | 0.10 mg/L | n/a | 0.0332 mg/L | 3 |
| 3/7/16 | Al | 1.8 mg/L | n/a | 0.75 mg/L | 3 |
| 3/7/16 | N+N | 2.24 mg/L | n/a | 0.68 mg/L | 3 |

63.   Water sample analyses between May 2012 and March 2016 (as summarized in Table 2) show consistent exceedances of the EPA benchmarks and

relevant NALs.  Table 2 demonstrates that Defendant has not implemented BMPs at Facility 3 that achieve compliance with the Act's BAT/BCT mandates.

64.     *Receiving Water Limitations Violations*.  The Basin Plan and the CTR establish relevant WQS for discharges from Facility 3.  The Basin Plan also provides a chemical constituent standard that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use.  Water designated for use as Domestic or Municipal Supply (MUN) shall not contain concentrations of chemical constituents in excess of the limits specified in the following provisions of Title 22 of the California Code of Regulations which are incorporated by reference into this plan: Table 64431-A of Section 64431 (Inorganic Chemicals)…"  Id. at 3-8.  The Basin Plan provides a MCL for Al of 1 mg/L.  Further, the CTR establishes numeric receiving water limits for certain toxic pollutants in California surface waters. The CTR sets forth a numeric limit for Zn at 0.067 mg/L in freshwater surface waters.  The CTR contains freshwater numeric water quality standards for Cu of 0.013 mg/L (CMC).  65 Fed. Reg. 31712 (May 18, 2000).  Based on these applicable WQSs, Facility 3 has violated and continues to violate the primary Receiving Water Limitations.

65.     Waterkeeper's review of the sampling data reported to the Regional Board demonstrates that Facility 3 has discharged and continues to discharge polluted storm water containing pollutant concentrations that violate the secondary Receiving Water Limitation.  Discharges from Facility 3 contain chemicals such as iron,

aluminum, lead and zinc, which can be acutely toxic and/or have sub-lethal impacts on the avian and aquatic wildlife in the Receiving Waters, and therefore these discharges adversely impact human health and the environment in violation of secondary Receiving Water Limitation.

66.    *Monitoring and Reporting Program Violations.*  Finally, based on information and belief, Facility 3 has violated and continues to violate the Permit's M&RP requirements. Among other violations, Facility 3 has failed to submit Annual Reports and/or as submitted incomplete Annual Reports.  Facility 3 has failed during multiple years to collect and analyze the requisite number of samples, and failed to test samples for all parameters required under the  Permit.  See 1997 Permit B(5)(c)(ii)-(iii); 2015 Permit XI(B)(6)(c)-(d).

*C. Facility 4*

67.    According to information and belief, Facility 4 is owned and/or operated by the NORTH STAR ACQUISITION, INC.

68.    Defendant obtained Permit coverage for Facility 4 on August 14, 2015 ("NOI 2015") with a WDID number of 19I023611. Plaintiff is informed and believes Facility 4 previously was enrolled for coverage under the 1997 Permit.  Facility 4 is classified under the "catch-all" SIC Code 3499 (Fabricated Metal Products, Not Elsewhere Classified) and located at 14912 S Broadway, Gardena. According to its 2015 SWPPP, this facility is primarily a "custom house" where Defendant's industrial activities include, but may not be limited to, providing rolled formed metal products

for various end uses requiring fabrication processes involving a wide range of sawing, bending, welding, chemical applications and curing techniques. UNIVERSAL MOLDING identifies the following pollutants as stored, used and/or produced on site: Shell Fenella Water Soluable Oil, Shell Dromus Oil B, Tellus Oil (Hydraulic Oil), Klendraw W-4179, And Ruby Titanium Grinding Oil.

69.     On information and belief, Plaintiff alleges storm water from Facility 4's industrial activities at this location flow from the property into the Dominguez Channel, and ultimately to the Pacific Ocean from at least three, and perhaps more, discharge points.

70.     *Effluent Limit Violations.*  As summarized below at Table 3, UNIVERSAL MOLDING's self-reporting "conclusive[ly]" proves a pattern of exceedances of benchmark/NAL values over the relevant statute of limitations period set forth in this Complaint, demonstrating consistent failure to implement adequate BMPs, and its ongoing violation of the Permit and Act. *Sierra Club v Union Oil*, 813 F.2d at 1493.

## TABLE 3

### SAMPLING DATA DEMONSTRATES ONGOING EXCEEDANCES OF EFFLUENT LIMITATIONS FOR MULTIPLE POLLUTANTS

| DATE | PARAMETER | OBSERVED CONCENTRATION | EPA BENCHMARK | APPLICABLE NAL (After 7/1/15) | Facility |
|------|-----------|------------------------|---------------|-------------------------------|----------|
| 5/14/15 | pH | 5.67 pH units | 6.0-9.0 pH units | n/a | 4 |

| 5/14/15 | pH | 5.84 pH units | 6.0-9.0 pH units | n/a | 4 |
|---------|----|----|----|----|----|
| 5/14/15 | Zn | 0.44 mg/L | 0.117 mg/L | n/a | 4 |
| 5/14/15 | Zn | 0.372 mg/L | 0.117 mg/L | n/a | 4 |
| 5/14/15 | Zn | 0.431 mg/L | 0.117 mg/L | n/a | 4 |
| 1/5/16 | Fe | 2.14 mg/L | n/a | 1.0 mg/L | 4 |
| 1/5/16 | Fe | 1.48 mg/L | n/a | 1.0 mg/L | 4 |
| 1/5/16 | Al | 1.44 mg/L | n/a | 0.75 mg/L | 4 |

71.     Water sample analyses between May 2015 and January 2016 (as summarized in Table 3) show consistent exceedances of the EPA benchmarks and relevant NALs—demonstrating that Defendant has not implemented adequate BMPs at Facility 4 to achieve compliance with the Act's BAT/BCT mandates.

72.     *Receiving Water Limitations Violations.*  The Basin Plan and the CTR establish relevant WQS for discharges from Facility 4.  The Basin Plan also provides a chemical constituent standard that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use.  Water designated for use as Domestic or Municipal Supply (MUN) shall not contain concentrations of chemical constituents in excess of the limits specified in the following provisions of Title 22 of the California Code of Regulations which are incorporated by reference into this plan: Table 64431-A of Section 64431 (Inorganic Chemicals)..." (see Basin Plan at 3-8).  The Basin Plan provides a MCL for Al of 1.0

mg/L.  Further, the CTR establishes numeric receiving water limits for certain toxic pollutants in California surface waters.  The CTR contains freshwater numeric water quality standards for Zn of 0.120 mg/L (CMC). 65 Fed. Reg. 31712 (May 18, 2000). Based on these applicable WQSs, Facility 4 has violated and continues to violate the primary Receiving Water Limitations.

73.     Additionally, the sampling data demonstrates that Facility 4 has and continues to violate the secondary Receiving Water Limitation because its discharges contain iron, aluminum, lead and zinc which as explained is acutely toxic to the Receiving Waters' avian and aquatic wildlife. Therefore, these discharges adversely impact human health and the environment in violation of secondary Receiving Water Limitations.

74.     *Monitoring and Reporting Program Violations*.  Finally, based on information and belief, Facility 4 has violated and continues to violate the Permit's M&RP requirements because, among its other violations, Facility 4 did not: 1) submit an Annual Report in 2011; 2) collect a single storm water sample for both reporting year 2012-13 and 2014-15; 3) during multiple years to collect and analyze the requisite number of storm water samples; and 4) analyze samples for all parameters required under the Permit.  See 1997 Permit B(5)(c)(ii)-(iii); 2015 Permit XI(B)(6)(c)-(d).

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**

**Discharges of Contaminated Storm Water in Violation of Permit Effluent Limitations and the Act**
**(33 U.S.C. §§ 1311, 1342, 1365(a), and 1365(f))**

75.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

76.     Effluent Limitation Sections B(3) of the 1997 Permit and V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendants continue to not reduce or prevent discharges of pH, N+N, iron, aluminum, copper, lead, zinc and other pollutants associated with industrial activities at the Facilities through implementation of BMPs that achieve BAT and BCT in violation of Effluent Limitation Sections B(3) of the 1997 Permit and V(A) of the 2015 Permit.

77.     Defendants violate the Storm Water Permit Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facilities.

78.     Each and every violation of the Storm Water Permit Effluent limitations is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

79.     The violations of the Storm Water Permit Effluent Limitations and the Clean Water Act described herein are ongoing and continuous.

80.     By committing the acts and omissions alleged above, the Owner and/or

Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from September 16, 2011 to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

81.    An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm LAW has no plain, speedy, or adequate remedy at law.

82.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

**SECOND CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Receiving Water Limitations and the Act**
**(33 U.S.C. §§ 1311, 1342, 1365(a), and 1365(f))**

83.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

84.    Receiving Water Limitation C(1) of the 1997 Permit prohibits storm water discharges and authorized non-storm water discharges to surface water that adversely impact human health or the environment.  The 2015 Permit includes the same Receiving Water Limitation.  See 2015 Permit, § VI.B.  Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic

COMPLAINT

species and the environment constitute violations of these Receiving Water

Limitations.

85.     Plaintiff is informed and believes, and thereupon alleges, that since at least

September 16, 2011, Defendants have discharged polluted storm water from the

Facilities causing or contributing to the violation of the applicable water quality

standards in a Statewide Water Quality Control Plan and/or the applicable Regional

Board's Basin Plan and that adversely impact human health or the environment in

violation of the Receiving Water Limitation of the General Permit.

86.     Every day, since at least September 16, 2011, that Defendants have

discharged and continue to discharge polluted storm water from the Facility in violation

of the General Permit is a separate and distinct violation of Section 301(a) of the Act,

33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

87.     By committing the acts and omissions alleged above, the Owner and/or

Operator is subject to an assessment of civil penalties for each and every violation of

the CWA occurring from September 16, 2011 to the present, pursuant to sections

309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

88.     An action for injunctive relief is authorized by CWA section 505(a),

33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

would irreparably harm Plaintiff and the citizens of the State of California, for which

harm LAW has no plain, speedy, or adequate remedy at law.

89.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)

COMPLAINT

because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## THIRD CAUSE OF ACTION
### Failure to Prepare, Implement, Review, and Update
### an Adequate Storm Water Pollution Prevention Plan
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

90.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

91.    Defendants have not developed and implemented an adequate SWPPP for the Facilities.

92.    Each day since September 16, 2011, that Defendants do not develop, implement and update an adequate SWPPP for the Facilities is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

93.    By committing the acts and omissions alleged above, the Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from September 16, 2011 to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

94.    An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm LAW has no plain, speedy, or adequate remedy at law.

COMPLAINT

95.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### FOURTH CAUSE OF ACTION
**Failure to Develop and Implement an
Adequate Monitoring and Reporting Program
(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

96.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

97.     Defendants have not developed and implemented an adequate monitoring and reporting program for the Facilities.

98.     Each day since September 16, 2011, that Defendants did not develop and implement an adequate monitoring and reporting program for the Facilities in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous.

99.     By committing the acts and omissions alleged above, the Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from September 16, 2011 to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

100.    An action for injunctive relief is authorized by CWA section 505(a),

COMPLAINT

33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm LAW has no plain, speedy, or adequate remedy at law.

101.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## FIFTH CAUSE OF ACTION
**Failure to Accurately Certify Compliance in Annual Reports in Violation of the Permit and the Act**
**(33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f))**

102.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

103.   Defendants have not accurately certified compliance with the General Permit in each of the annual reports submitted to the Regional Board since at least September 16, 2011.

104.   Each day since at least September 16, 2011, that Defendants do not accurately certify compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). Defendants continue to be in violation of the General Permit's certification requirement each day they maintain an inaccurate certification of its compliance with the General Permit.

COMPLAINT

105.     By committing the acts and omissions alleged above, the Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from September 16, 2011 to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

106.   An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm LAW has no plain, speedy, or adequate remedy at law.

107.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## **RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  Declare Defendant(s) to have violated and to be in violation of the Act as alleged herein;

b.  Enjoin Defendant(s) from discharging polluted storm water from the Facilities unless authorized by the Permit;

c.  Enjoin Defendant(s) from further violating the substantive and

COMPLAINT

procedural requirements of the Permit;

   d. Order Defendant(s) to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT and prevent pollutants in the Facilities storm water from contributing to violations of any water quality standards;

   e. Order Defendant(s) to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

   f. Order Defendant(s) to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

   g. Order Defendant(s) to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

   h. Order Defendant(s) to pay civil penalties of $37,500 per day per violation for all violations pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

   i. Order Defendant(s) to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

   j. Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

COMPLAINT

1           k.   Award any such other and further relief, as this Court may deem

2 appropriate.

3

4

5 Dated: _____9/16_____, 2016          Respectfully submitted,

6

7                              By:   _____

8                                  Gideon Kracov
                                      Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT